IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> v. <br><br> DOMINGO MARTINEZ, <br><br> Defendant. | CRIMINAL CASE NO. <br> 1:21-cr-00015-LMM-LTW |

# **FINAL REPORT AND RECOMMENDATION AND ORDER CERTIFYING THIS CASE READY FOR TRIAL**

This matter is presently before the Court on a Motion to Suppress filed by Defendant Domingo Martinez. [Doc. 14]. On September 16, 2021, the undersigned held an evidentiary hearing on the motion. [Doc. 30]. Defendant perfected his motion on January 11, 2022. [Doc. 37]. The Government filed its response in opposition to Defendant's motions. [Doc. 38]. Defendant did not file a reply within the timeframe ordered by the Court and did not seek an extension of time for his reply. See [Doc. 39]. As such, the motion is ripe for review. For the reasons outlined below, the Court **RECOMMENDS** that Defendant's Motion to Suppress be **DENIED**. [Doc. 14].

# FACTUAL BACKGROUND

On December 5, 2019, Georgia State Patrol Trooper Brian Harman and Corporal David Whitehead saw Defendant driving south on Interstate 85 in Troup County, Georgia. [Doc. 31 ("Tr.") at 8:13–17]. The patrol car's radar indicated Defendant was traveling 72 miles per hour in a 70-mile-per-hour zone. [Id. at 10:11–19]. Corporal Whitehead also noticed that Defendant's vehicle "had a heavily cracked windshield." [Id. at 12:10–13:11]; see also [Gov't Ex. 2].[1] The officers pulled Defendant over, and Trooper Harman spoke with him. [Tr. at 37:3–9]. After discussing the speeding, Trooper Harman informed Defendant he would be receiving a warning and asked Defendant to step out of the vehicle, as was his standard practice. See [id. at 11:21–12:4]. As part of his standard procedure, Trooper Harman then patted Defendant down "just to make sure [he didn't] have any weapons." [Id. at 12:5–9].

About two-and-a-half minutes into the stop, Trooper Harman retrieved his writing pad to issue the warning to Defendant. [Gov. Ex. 1 at 2:25–2:35]. While

---

[1] Defendant notes that Trooper Harman did not mention the cracked windshield during his conversation with Defendant. [Doc. 37 at 1]. This fact, however, appears to be irrelevant for two reasons. First, Corporal Whitehead noticed the cracked windshield, not Trooper Harman. [Tr. at 12:10–16]. Second, the constitutionality of a traffic stop does not depend "on the actual motivations of the officers involved." Whren v. United States, 517 U.S. 806, 813 (1996).

writing the warning, Trooper Harman asked Defendant about his residence and travel plans, and Defendant explained that he owned a trucking company based out of Washington and traveled from Texas to Atlanta because one of his trucks had been damaged. [Id. at 2:42–4:00]. Defendant told Trooper Harman he had traveled north from Troup County to Atlanta between 8:30 and 10:00 p.m. the previous night. [Tr. at 13:13–14:14]; see also [Gov. Ex. 1 at 4:25–5:17]. Trooper Harman knew this to be false because license plate readers showed Defendant was in Victoria, Texas the previous day at a time when he would not have had "enough time to [get to] Georgia at the time he said he was in Georgia. [Tr. at 15:9–13]. The license plate readers also showed Defendant had traveled north through Troup County toward Atlanta just an hour before he was stopped traveling south in Troup County. See [id. at 15:14–16]; see also [id. at 23:3–10].

Trooper Harman testified that, during their conversation, Defendant appeared nervous, moved his hands a lot, and would "look[ ] up, trying to think about what he need[ed] to say" when asked a question. [Id. at 15:22–16:5]. Trooper Harman found Defendant's statements about the purpose of his travel "odd," noting that Defendant would be "losing money" if he really decided "to drive 17 hours just to put a vehicle in a shop" when he could have handled the matter "over the phone." [Tr. at 17:10–18].

3

Approximately eight minutes after the traffic stop began, Trooper Harman asked Defendant for consent to search the vehicle, and Defendant said he had no objection. [Gov. Ex. 1 7:52–8:25].  Trooper Harman was still writing the warning and told Defendant he would finish it before searching the vehicle.  [Id. at 8:23–8:58].

The officers printed out a consent-to-search form, explained the form to Defendant, and had him sign it.  See [Tr. at 21:6–22:17].  The officers then searched the vehicle, finding a large amount of chase bound with rubber bands and a Taurus 9mm pistol.  [Id. at 24:21–25:16].  In this case, Defendant is charged with a single count of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(l). [Doc. 1].  Defendant moves to suppress the search of his vehicle, arguing that the reason for the stop was pretextual, that Trooper Harman's questioning impermissibly extended the traffic stop, and that any consent was tainted by the "illegal search."  [Doc. 38].

## LEGAL STANDARD

The Fourth Amendment protects people from unreasonable search and seizures. See U.S. CONST. amend. IV.  A traffic stop constitutes a seizure within the meaning of the Fourth Amendment.  Delaware v. Prouse, 440 U.S. 648, 653 (1979).  However, a routine traffic stop is a limited form of a seizure, more akin to an investigative detention than a custodial arrest.  United States v. Purcell, 236 F.3d 1274, 1277 (11th Cir. 2001)

(citing Berkemer v. McCarty, 468 U.S. 420, 437 (1984)). In evaluating the constitutionality of an investigatory stop, the court must examine "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." Terry v. Ohio, 392 U.S. 1, 20 (1968). The duration of the investigative detention must "last no longer than is necessary to effectuate the purpose of the stop." Florida v. Royer, 460 U.S. 491, 500 (1983). However, officers are still allowed to ask ordinary inquiries incident to every traffic stop, such as "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." Rodriguez v. United States, 575 U.S. 348, 355 (2015).

## **ANALYSIS**

Defendant does not dispute that he was traveling over the speed limit. [Doc. 38 at 3]. Although Defendant acknowledges that the officer's subjective reasons for stopping a vehicle play no part in the Fourth Amendment analysis, he asserts that stopping a vehicle "for traveling 2 mph over the posted speed limit" is unconstitutional. [Id.].[2] Defendant's argument falls short. To the contrary, a defendant's beliefs about

---

[2] As noted by the Supreme Court, arguments about the "selective enforcement of the law" sound in Equal Protection, not the Fourth Amendment. Whren v. United States, 517 U.S. 806, 813 (1996). Defendant makes no argument—and there is no

5

what amount of speeding "is 'too *de minimus*' to justify the stop" plays no part in the Fourth Amendment analysis. United States v. Gelin, 810 F. App'x 712, 719 (11th Cir. 2020) (rejecting a defendant's argument that the reason for his stop was pretextual where the defendant was "driving six miles per hour over the speed limit"). Under Georgia law, "no person shall drive a vehicle at a speed in excess of" 70 miles per hour "on a highway on the federal interstate system." See O.C.G.A. § 40-6-181(b). Here, Defendant was speeding, and thus the officers had probable cause to pull him over. See Gelin, 810 F. App'x at 719.[3]

The crux of Defendant's argument is that issuing a warning ticket did not "require[ ] *any* questioning except to confirm [Defendant's] name." [Doc. 38 at 4] (emphasis in original). Defendant contends that asking *any* question "unrelated to the 2 mph speeding violation" unconstitutionally extended the scope of the traffic stop. [Id. at 4–5]. Defendant's argument is without merit. The permissible duration of a

---

evidence—that the officers subjected him to an "intentionally discriminatory application of the laws." See id.

[3] The officers also had probable cause to stop Defendant based on the "heavily cracked windshield." See [id. at 12:10–13:11]. Whether the windshield violated Georgia law is not the issue; officers do not need "to ascertain conclusively whether a violation [has] occurred before they would have probable cause to investigate it." United States v. Weaver, 145 F. App'x 639, 641 (11th Cir. 2005).

traffic stop depends on both "the traffic offense *and* the ordinary inquiries incident to such a stop." Illinois v. Caballes, 543 U.S. 405, 408 (2005) (emphasis added). "Generally, questions related to an individual's traffic plans or itinerary are ordinary inquires related to a traffic stop." United States v. Braddy, 11 F.4th 1298, 1311 (11th Cir. 2021). This is especially true where, as here, the driver is from out of state. See id. Trooper Harman's questions about Defendant's travel itinerary, which occurred within approximately two-and-a-half minutes of when he began writing the warning, were "well within the scope of the traffic stop" and not an impermissible extension of the scope of the stop. See id.; see also [Gov. Ex. 1 at 2:30–5:17].

Defendant's answers to Trooper Harman's questions raised a reasonable suspicion of further criminal activity. Defendant claimed to have traveled north through Troup County the previous day at 8:30 p.m., which Trooper Harman knew to be false. [Tr. at 23:3–10]. In fact, Defendant had traveled through Troup County just an hour before. [Id.]. In addition, Trooper Harman credibly testified that he found Defendant's statements about the purpose of his travel "odd." [Tr. at 17:10–18]. For Defendant's story to be true, he would have had to travel from approximately 17 hours from Texas to Atlanta simply to make arrangements for the repair of a damaged vehicle, and then returned to Troup County approximately an hour later. Furthermore,

Trooper Harman noticed that Defendant appeared nervous, moved his hands a lot, and would "look[ ] up, trying to think about what he need[ed] to say" when asked a question. [Id. at 15:22–16:5]. Under the totality of the circumstances, Trooper Harman had a "reasonable suspicion that some additional wrongdoing might have been afoot," justifying any subsequent extension of the traffic stop. See United States v. Thomas, 817 F. App'x 902, 906 (11th Cir. 2020) (holding that, *inter alia*, the defendant's "inconsistent and evasive answers to simple questions about his travel plans" and nervous behavior justified additional questioning). Trooper Harman developed that reasonable suspicion while he was still writing the warning for "the traffic offense and [asking] the ordinary inquiries incident to such a stop," and as such he did not impermissibly prolong the stop. See Caballes, 543 U.S. at 408.

Even if some of Trooper Harman's questions had impermissibly extended the scope of the traffic stop, that would not automatically entitle Defendant to suppression as a remedy. Herring v. United States, 555 U.S. 135, 141 (2009) ("We have repeatedly rejected the argument that exclusion is a necessary consequence of a Fourth Amendment violation."). Where a Defendant consents to a search after illegal police activity, the Court conducts a two-part inquiry: "First, a court must determine whether the consent was voluntary. Second, the court must determine whether the consent,

even if voluntary, requires exclusion of the evidence found during the search because it was the 'fruit of the poisonous tree'—the product of [illegal police conduct]." United States v. Delancy, 502 F.3d 1297, 1308 (11th Cir. 2007). The Government bears the burden on both issues. Id.

The Government demonstrates—and Defendant does not contest—that Defendant's consent was voluntary. See [Doc. 38 at 7]; see also [Doc. 37 at 5]. The officers did not coerce or threaten Defendant, and Defendant signed a form acknowledging his consent was "freely and voluntarily given," was not the result of any "promises, threats, force, physical or mental coercion of any kind whatsoever," and that he had the right to "refuse to consent to the search." See [Tr. at 18:1–11, 22:8–22:6]; [Gov. Ex. 4]. Instead, Defendant argues his consent, while voluntary, was "directly a product of the extended illegality." [Doc. 37 at 5].

Whether a defendant's consent was "sufficiently an act of free will to purge the primary taint of the unlawful invasion" or "so attenuated as to dissipate the taint" is a fact-specific inquiry. Delancy, 502 F.3d at 1309 (quoting Wong Sun v. United States, 371 U.S. 471, 486–87 (1963)). In analyzing this question, the Court considers a non-exhaustive list of factors including the temporal proximity of the seizure and the consent, the presence of intervening circumstances, the purpose and flagrancy of the

misconduct, whether the consent was volunteered or asked for, and whether the defendant was advised of his right to refuse to consent. Delancy, 502 F.3d at 1309–10. Here, the totality of the circumstances demonstrates Defendant's consent was an act of his free will and not the product of any purported illegal activity.

While the passage of time between Trooper Harman's questioning and Defendant's consent was brief, this "is not the most important factor" because Defendant was not handcuffed, the officers did not draw their weapons, and "the interaction was conversational in tone." Delancy, 502 F.3d at 1311. Instead, there was "an important intervening circumstance: [Defendant's] review and signing of the consent form, which served as a notification to [Defendant] of [his] constitutional rights." Id. As the Government has demonstrated, Defendant was made aware of his rights under the Fourth Amendment, and he "made a knowing, intelligent, and voluntary choice to sign the form in the absence of any coercion or threats from the police." Id. at 1312; see also [Gov. Ex. 4].

Last, "the purpose and flagrancy" of Officer Harman's alleged misconduct weighs against exclusion. As noted above, the officers clearly had probable cause to conduct a traffic stop and Officer Harman's questions about Defendant's travels were well within the scope of the traffic stop. Even if Defendant were correct that "*any*

10

questioning except to confirm his name" was a constitutional violation, the Court finds that Officer Harman's conversational questions were not a purposeful or flagrant violation. If Trooper Harman "impermissibly" extended the traffic stop by asking follow-up questions about Defendant's company and travel itinerary, it is because Defendant's answers to Trooper Harman's initial questions were false and unbelievable. That is, Trooper Harman's motivation was to understand Defendant's story, not to trick Defendant into consenting to a search of the vehicle. Trooper Harman's actions, "even if unlawful, were not flagrantly so." See Delancy, 502 F.3d at 1312.

As discussed above, the undersigned concludes that the traffic stop was constitutionally justified and that the officers did not impermissibly extend the stop before obtaining a reasonable suspicion of additional illegal activity. Even if Trooper Harman's actions were in some way illegal, the purportedly illegal conduct was not purposeful or flagrant and Defendant's knowing, intelligent, and voluntary consent to the search of his vehicle was an act of his own free will. As such, Defendant is not entitled to suppression of the evidence obtained during the search.

## CONCLUSION

For the foregoing reasons, the undersigned **RECOMMENDS** that Defendant's Motion to Suppress ([Doc. 14]) be **DENIED**. There are no other pending matters before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of this case. **IT IS THEREFORE ORDERED** and **ADJUDGED** that this action be and the same is hereby, declared Ready for Trial.

**SO ORDERED, REPORTED, AND RECOMMENDED**, this __24__ day of February, 2022.

_____
LINDA T. WALKER
UNITED STATES MAGISTRATE JUDGE